ROBERT L. BUNNEL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ROBERT L. BUNNEL AND VOLA V. BUNNEL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5373–66, 5374–66. Filed September 9, 1968.

*Kendall O. Schlenker*, for the petitioners.
*Marvin T. Scott*, for the respondent.

TANNENWALD, *Judge:* Respondent determined (a) deficiencies in petitioner Robert L. Bunnel's 1958 income tax in the amount of $1,267.31 and an addition to tax in the amount of $63.37 and (b) deficiencies in petitioners Robert L. Bunnel and Vola V. Bunnel's 1960 and 1961 income tax in the amounts of $24,695.10 and $10,804.89, respectively, and additions to tax in the amounts of $1,234.76 and $540.24, respectively. The cases were consolidated for trial. After concessions by both petitioners and respondent, three issues remain for disposition: First, whether the mailing to a corporation, which has made a valid election pursuant to subchapter S of the Internal Revenue Code (sec. 1371, *et seq.*), of a notice of deficiency is a prerequisite to assertion against its shareholders of a deficiency in tax, based upon adjustments in the income of the corporation; second, whether certain income was derived from the sale of property and, if so, whether such property was held primarily for the sale to customers in the ordinary course of business; third, whether there was any underpayment of tax due to negligence.

FINDINGS OF FACT

Some of the facts were stipulated and are found accordingly.

Robert L. Bunnel (hereinafter referred to as Robert) was unmarried at the end of 1958 and filed an individual income tax return for that year with the district director of internal revenue, Albuquerque, N. Mex. Robert married Vola V. Bunnel (hereinafter referred to as Vola) in 1959 and they were husband and wife in 1960 and 1961. They

filed a joint income tax return for each of those years with said district director. Both were legal residents of New Mexico at the time of the filing of the petitions herein.

From 1946 until 1955, Robert was employed as office manager for an independent oil operator in Carlsbad, N. Mex. From 1955 until sometime in 1957, he worked for such operator on a part-time basis and began business activities for his own account. In 1957, he began devoting all of his time to his own business activities, most of which were related to the leasing of land owned by the Federal Government. Vola had been active in Federal leasing activities since 1953.

On March 13, 1959, in order to avoid the filing of liens against properties held in Robert's name in connection with judgments which had been obtained against him, petitioners organized Senemex, Inc., for the purposes of dealing in oil and gas properties. In exchange for $5,000 cash and certain oil and gas properties, including leases, petitioners each received 25 shares of Senemex stock, which at all times pertinent has constituted all of its issued and outstanding shares. During its fiscal years 1960 and 1961, a valid election under subchapter S was in effect for Senemex. During 1959, 1960, and 1961, Senemex was listed in the Sante Fe, N. Mex., telephone directory under the heading "Oil Properties." In addition, Senemex was listed in 1961 under "Oil Leases," and "Oil Report Companies."

The business activities of petitioners and Senemex consisted in large part of the acquisition of leases on land owned by the Federal Government by grant from the Government or by assignment from a third party. Some leases were obtained on land owned by State governments. An acquisition was often made by petitioners with the intention of subsequently assigning the lease to a third party, usually a company involved in the business of extracting oil. Petitioners carried out this intention by granting an option to the company to acquire the lease at such time as it desired and petitioners received payment for the assignment or for their services when the option was exercised.

The option device was employed because of acreage restrictions on leases of Federal oil and gas properties and because, in some cases, the third party did not wish its interest to be publicly known. Options often did not appear on the records of the Bureau of Land Management of the Department of the Interior, which was responsible for administering the leasing program. Where there were no acreage restrictions or other need for secrecy, petitioners would buy or sell leases on behalf of and in the names of third parties on a commission basis.

The regulations of the Bureau of Land Management with respect to offers to lease required the offeror to state whether or not he was the sole party in interest and to set forth the names of interested parties,

the extent of their interests, and whether the agreement with third parties was oral or written. In the case of those leases which were reported in the returns for the years in question of Senemex and petitioners as having been sold following a holding period of more than 6 months, the abstracts of the Bureau of Land Management (with one exception, not involved herein) showed ownership in third parties and did not indicate either Senemex or petitioners to be a party in interest.

During 1958, 127 applications for leases of Federal land were filed in the name of Robert and 10 in the name of Vola. Robert filed 43 other applications on behalf of third parties. As a result of these filings, 13 leases were issued in Robert's name and four in the names of other persons. During 1959, petitioners and Senemex together filed 88 applications to lease Federal lands on their own accounts. In addition, throughout these years, petitioner acquired 19 and Senemex 26 State leases, most of which were transferred by assignment. During the period from June 1957 through December 1961, Robert, Vola, and Senemex engaged in approximately 80 brokerage transactions. Robert also had interests in the drilling of 28 oil wells during the period 1957 through 1961.

On his 1958 return, Robert reported the sale of 14 leases. Two were reported as giving rise to long-term gain of $5,030.95[1] and 11 as giving rise to short-term gain of $11,948.23. Petitioners reported, on their joint Federal income tax returns for the years 1959 through 1962, the sale of 14 leases as giving rise to long-term capital gains totaling $55.093.79. Senemex reported on its returns for the fiscal years ending September 30, 1959, through September 30, 1962, the sale of 36 leases. Short-term capital gains of $67,737.77 were reported on the sales of 10 leases and long-term capital gains of $140,277.93 on the sales of 26 leases. Some portion of the aforementioned amounts reported by petitioners and Senemex as short-term capital gains represented compensation for services rendered.

Among the reasons for the sales of the leases by petitioners and Senemex in question in 1958, 1960, and 1961 were the following: (a) To raise funds to liquidate obligations incurred in other enterprises; (b) to invest funds in other enterprises; (c) because continued ownership would have required additional investment in lease development.

ULTIMATE FINDING OF FACT

To the extent that the leases in question were sold, the sales were of property held primarily for sale to customers in the ordinary course of a trade or business.

---

[1] The amount of $8,673.16 was reported as long-term capital gain on a third lease and is not disputed by the respondent.

OPINION

We deal first with the question whether the notices of deficiency herein, insofar as they relate to adjustments in the income of Senemex, satisfy the statutory requirements of sections 6212(a) and 6213 (a) and (c)[2] that a notice of deficiency must be sent to the "taxpayer." Petitioners argue that the information return, which under section 6037 must be filed by an electing corporation, is expressly made subject to the statute of limitations on assessment of deficiencies by respondent. From this fact, they assert that an electing corporation must be the "taxpayer," since otherwise, as they put it, "there is no point in the * * * reference to the statute of limitations." They therefore conclude that the failure to issue notices to Senemex with respect to the tax deficiencies allegedly arising from its 1960 and 1961 income makes the notices issued to them invalid to the extent of such deficiencies.

Respondent answers that, since section 1372(b)(1) provides that an electing corporation "shall not be subject to the taxes imposed by this chapter," therefore Senemex is not the "taxpayer" within the meaning of the relevant Code sections. He asserts that the reference to the statute of limitations is required in the event that it is determined that the election was not effective.

We hold for the respondent.

Sections 6212(a) and 6213 (a) and (c) require the Secretary of the Treasury or his delegate to give notice to the "taxpayer" of the asserted deficiency in taxes imposed by subtitles A and B as a prerequisite, except under exceptional circumstances, to ultimate collection from a reluctant obligor. None of these sections defines the term "taxpayer." Section 7701(a) does provide a definition; it requires that,

---

[2] All references are to the Internal Revenue Code of 1954.

SEC. 6212. NOTICE OF DEFICIENCY.

(a) IN GENERAL.—If the Secretary or his delegate determines that there is a deficiency in respect of any tax imposed by subtitles A or B, he is authorized to send notice of such deficiency to the taxpayer by certified mail or registered mail.,

SEC. 6213. RESTRICTIONS APPLICABLE TO DEFICIENCIES; PETITION TO TAX COURT.

(a) TIME FOR FILING PETITION AND RESTRICTION ON ASSESSMENT.—Within 90 days, or 150 days if the notice is addressed to a person outside the States of the Union and the District of Columbia, after the notice of deficiency authorized in section 6212 is mailed (not counting Saturday, Sunday, or a legal holiday in the District of Columbia as the last day), the taxpayer may file a petition with the Tax Court for a redetermination of the deficiency. Except as otherwise provided in section 6861 no assessment of a deficiency in respect of any tax imposed by subtitle A or B and no levy or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of such 90-day or 150-day period, as the case may be, nor, if a petition has been filed with the Tax Court, until the decision of the Tax Court has become final. * * *

\* \* \* \* \* \* \*

(c) FAILURE TO FILE PETITION.—If the taxpayer does not file a petition with the Tax Court within the time prescribed in subsection (a), the deficiency, notice of which has been mailed to the taxpayer, shall be assessed and shall be paid upon notice and demand from the Secretary or his delegate.

unless the definition of taxpayer in subdivision (14) thereof is "manifestly incompatible with the intent of" such sections, that definition is to be applied. Section 7701(a)(14) provides: "Taxpayer—The term 'taxpayer' means any person subject to any internal revenue tax." (Emphasis added.)

Were we to apply literally the definition of taxpayer in section 7701 (a)(14) to sections 6212(a) and 6213 (a) and (c), without regard to the purpose Congress intended them to serve, it would follow that Senemex was a "taxpayer," since the election did not extend its freedom from tax to every "internal revenue tax"; it still remained liable for other taxes imposed by the Code—for example, social security taxes payable with respect to its employees under section 3111.

But such a construction has only the merit of literalistic consistency. Moreover, we note that since, by virtue of section 1372(b)(1), the existence of a valid election relieved Senemex of income tax liability for the years in question, there could be no "tax imposed" and therefore no "deficiency" as to it within the meaning of section 6211.[3] Consequently, if we were to adopt petitioners' theory of literal construction, respondent would never be able, under the circumstances herein, to effectuate compliance with the statutory requirement that a "notice of deficiency" be issued. The absurdity of such a result reveals the hollow ring of petitioners' position. The courts can reject the literal meaning of the words of a statute "where acceptance of that meaning would lead to absurd results." See *Commissioner* v. *Brown*, 380 U.S. 563, 571 (1965). Certainly, this injunction to avoid absurdity takes on even greater meaning in a case such as this where the statute itself provides that its terms should not be "manifestly incompatible with the intent of" other sections of the Code.

Our reasoning carries within it the answer to petitioners' contention regarding the applicability of the statute of limitations. If, for some reason, the election is not effective, then section 1372(b)(1) would be inapplicable and the corporation would be subject to, and entitled to the benefits of, the statute of limitations on assessment of deficiencies. Hence the necessity for the reference to the statute of limitations.

By virtue of the subchapter S election, petitioners became directly liable for income taxes on the income of Senemex. As such, they were taxpayers in their own right with respect to the income of Sene-

---

[3] SEC. 6211. DEFINITION OF A DEFICIENCY.

(a) IN GENERAL.—For purposes of this title in the case of income, estate, and gift taxes, imposed by subtitles A and B, the term "deficiency" means the amount by which the tax imposed by subtitles A or B exceeds the excess of—

(1) the sum of

(A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon. * * *

mex. The purpose of the statutory requirements is directly to inform a taxpayer of a claim against him for additional taxes *due from him* and to protect him against being bound by notices of deficiencies addressed to another person or improperly addressed to the taxpayer. See *Ben Perlmutter*, 44 T.C. 382, 400 (1965), affd. 373 F.2d 45 (C.A. 10, 1965). Petitioners herein were so informed directly and unequivocally.

In view of the foregoing, we hold that Senemex was not "the taxpayer" and that the deficiency notices herein fully satisfied the statutory requirements.[4] Any other conclusion would require an "archaic spirit" which we are not prepared to accept as our inspiration for decision. See *Olsen* v. *Helvering*, 88 F.2d 650, 651 (C.A. 2, 1937); cf. *Dolezilek* v. *Commissioner*, 212 F.2d 458 (C.A.D.C. 1954); *Olsen* v. *Helvering, supra; Estate of John T. Eversole*, 39 T.C. 1113 (1963).

We turn now to the substantive issues involved herein. The first such issue is whether certain income of petitioners and Senemex arising from the disposition of certain leases is entitled to capital gains treatment or whether such income, even if derived from sales of property, is not entitled to such treatment because the property was held "primarily for sale to customers in the ordinary course of business." Secs. 1221(1) and 1231(b). At the outset, we note that there is considerable evidence in the record herein that some of such income represented nothing more than commissions to petitioners and Senemex for services rendered in buying and selling leases for others.[5] We find it unnecessary to unravel the factual elements involved in determining whether the income in question constituted "commissions" or the "proceeds of sales," since we have concluded that, in any event, the capital gains exceptions of sections 1221(1) and 1231(b) do not apply. We similarly do not reach the question of the holding period for each lease.

Whether property is held "primarily for sale to customers in the ordinary course of business" is a question of fact and the taxpayer has the burden of proof. *S. O. Bynum*, 46 T.C. 295, 298 (1966). In that case, we emphasized that this exclusionary language of sections 1221 (1) and 1231(b) was intended to distinguish profits and losses arising

---

[4] Even if a subchapter S corporation is subject to income tax on a portion of its income, it would not necessarily follow that the deficiency notices to the shareholders on income taxable to them were invalid because no notices of those deficiencies were first sent to the corporation. Compare sec. 1378, enacted subsequent to the years in issue herein.

[5] Petitioners conceded on brief that some of the "sales" with respect to which they reported income on their returns were in reality not sales at all, but reflected compensation for services rendered. While petitioners limited this concession to "sales" with respect to which short-term capital gain was reported, there is a serious doubt in our mind that they have satisfactorily explained away the absence of their ownership on the official records with respect to "sales" reported as having given rise to long-term capital gains.

from the everyday operation of a business from the realization of appreciation in value accrued over a substantial period of time. See 46 T.C. at 299.

Essentially, petitioners' argument turns upon the assertion that they acquired and held the leases as investments and that the sales were forced in order to liquidate obligations in other enterprises, to obtain funds desired for investment in other enterprises, and to deal with situations where petitioners were unable to put up the necessary funds to permit development of the leases. On this basis, petitioners seek to bring themselves within the ambit of innumerable cases which have permited capital gains treatment where property was acquired as an investment and later sold under the compulsion of change in circumstances. We think petitioners conveniently close their eyes to the fact that the sales of the leases were part and parcel of on-going dealings in oil enterprises and that the reasons for the sales simply reflected the recurrent and foreseeable needs of those enterprises. The program whereby petitioners and Senemex acquired the leases was, from its inception, afflicted by a built-in "termititis" which consistently and continuously undermined and destroyed whatever investment purpose may have been involved. Petitioners have failed to convince us that the leases in question were not "*primarily* held for sale to customers in the ordinary course of business."

The second substantive issue is whether petitioners are liable for the addition to tax for negligence in the years before us which is imposed under section 6653(a) if "any part of the underpayment * * * is due to negligence or intentional disregard of rules and regulations." Again the burden of proof is upon the petitioners. Even assuming that Robert and Vola's claim of an honest misunderstanding of the facts and/or law, with respect to the tax consequences of the sales of leases, would be sufficient to avoid the addition to tax, petitioners cannot prevail. We cannot ignore the fact that, with respect to each of the years before us, petitioners conceded that several items, representing substantial amounts in such categories as payments of debts and excessive expenses were improperly deducted on their returns. Petitioners offered no evidence whatsoever regarding these items. Accordingly, since section 6653(a) provides for the addition to tax if "any part" of any underpayment is due to negligence, we hold that the petitioners have failed to meet their burden of proof and are liable for the addition to tax in each of the years before us. *Bunnel v. United States*, ——— F. Supp. ——— (D.N.Mex. 1967, 20 A.F.T.R. 2d 5696, 68–1 U.S.T.C. par. 9121); *Lark L. Washburn*, 44 T.C. 217, 226 (1965); *David Courtney*, 28 T.C. 658 (1957); *Rhett W. Woody*, 19 T.C. 350, 354–355 (1952).

*Decisions will be entered under Rule 50.*